IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
CANTON, OHIO

| | |
|---|---|
| IN RE: | CASE NO. 14-62604 |
| SCOTT D. SCHROEDER, | CHAPTER 7 |
| Debtor. | BANKRUPTCY JUDGE RUSS KENDIG |
| ANNE PIERO SILAGY, TRUSTEE, | ADV. PROC. NO. 16-06017 |
| Plaintiff, | |
| vs. | **TRUSTEE'S MOTION FOR SUMMARY JUDGMENT** |
| ROBBYE SCHROEDER, | |
| Defendant. | |

The Plaintiff in this Adversary Proceeding, Anne Piero Silagy, Chapter 7 Trustee (the "Trustee"), by and through counsel, moves this Court pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, made applicable hereto by Rule 7056 of the Federal Rules of Bankruptcy Procedure, for summary judgment against the Defendant Robbye Schroeder. The Trustee asserts that there are no genuine issues as to any material fact and that the Trustee is entitled to judgment as a matter of law upon her claims to avoid the transfers of $60,046.40, $3,000, and $6,000 from the Debtor Scott D. Schroeder to the Defendant Robbye Schroeder pursuant to 11 U.S.C. §§ 548, *et seq.*, 550(a) and 544 and R.C. §§ 1336.04, *et seq.* and 1336.05 and to recover property of the estate under 11 U.S.C. § 542. The Trustee submits the following Memorandum in Support of this Motion for Summary Judgment.

               Respectfully submitted,

               /s/ Roger J. Stevenson
               Roger . Stevenson - 0014366
               Bruce R. Schrader, II – 0039418
               Roetzel & Andress, LPA
               222 South Main Street
               Akron, OH 44308
               E-mail: rstevenson@ralaw.com
               E-mail: bschrader@ralaw.com
               Telephone: 330.376.2700
               Facsimile: 330.376.4577

               ATTORNEYS FOR PLAINTIFF ANNE
               PIERO SILAGY, CHAPTER 7 TRUSTEE

## **MEMORANDUM IN SUPPORT**

**I.    STATEMENT OF FACTS**

The Debtor Scott D. Schroeder (hereinafter referred to as "Scott") and the Defendant Robbye Schroeder (hereinafter referred to as "Robbye") were married on February 26, 2000. (*See* page 15, lines 9 through 11, of the transcript of Robbye's September 19, 2016 deposition which has been filed with the Court as Adversary Proceeding Docket No. 11. Further references to that transcript will be in the form of "Robbye's depo page x, lines y –z.")

Scott was in the financial services business, sold securities, sold insurance, and did retirement planning. (Robbye's depo page 8, line 24, through page 9, line 2.)

Robbye has a master's degree in education (Robbye's depo page 5, lines 11 -12) and worked as an English teacher until 2010 (Robbye's depo page 15, lines 2 – 8). She was not employed again until January 5, 2015, when she started working for Newmark, Grubb, Knight, Frank as a commercial real estate agent. (Robbye's depo page 12, lines 2 -5 and page 15, lines 15

– 25.) Robbye was not employed in 2011, 2012, 2013, and 2014. (Robbye's depo page 14, line 24, though page 15, line 4)

Robbye has "written all kinds of things," including "almost an entire commercial banking website for Union Banking in California" in 2004, and a book about financial planning in 2012. (Robbye's depo page 62, line 6 – 20) On the back cover of one of her books, Robbye described herself, accurately, as a "recovering spendaholic who has paid off over $100,000 in debt." (Robbye's depo page 64, lines 4 – 25, and Exhibit 31)

Scott and Robbye sold their home in Topanga Canyon, California for about $1,118,000 in 2012 and moved into a rental house in Los Angeles. They moved from Los Angeles to Canton, Ohio in November of 2013 because Scott was merging his business with a financial advising/insurance firm in Canton. (Robbye's depo page 8, line 17, through page 9, line 15)

In November of 2013, Scott and Robbye bought a house at 125 19th Street, NW, in Canton, using money from Scott's business and $323,000 which they borrowed from FirstMerit Bank. (Robbye's depo page 6, line 20, through page 7, line 3, and page 10, lines 8 – 23.) At the time they bought the house in Canton, Robbye knew there were lawsuits pending against Scott. (Robbye's depo page 32, lines 1 – 14.)

Both Scott and Robbye were obligated on the $323,000 mortgage loan from FirstMerit Bank. (Robbye's depo page 12, lines 16 – 21.) They moved out of Canton in December of 2014, but, as of September 19, 2016, they still owned their Canton house, which was then vacant and worth less than the approximately $300,000 still owed on it. (Robbye's depo page 11, line 5 through page 12, line 1, and page 12, line 23 through page 13, line 2.)

"Things started going wrong with the marriage" in October of 2014. (Robbye's depo page 15, lines 14 – 19, and page 16, lines 10 – 21). Robbye filed for divorce in July of 2015 and

the divorce was finalized in December of 2015. (Robbye's depo page 16, lines 3 – 6, page 17, lines 3 – 10, and page 18, line 24 through page 19, line 2.)

Robbye divorced Scott for financial reasons, and because, with everything that had happened in his business in the last two and a half years, there was a lot of uncertainty, she had lost trust in him, and she had lost faith in what he said. (Robbye's depo page 21, line 23 through page 22, line 8.) Despite their divorce, Scott and Robbye continue to live together (Robbye's depo page 14, line 22 – 23 and page 18, line 22 – 23.)

**The Joint Bank Accounts**.

Scott and Robbye had a joint checking account and a joint savings account for a period of time which included December 21, 2013 through October 22, 2014. (See Robbye's depo page 40, line 8, through page 44, line 6, and bank statements attached thereto as Exhibits number 6 through 15.)

On April 30, 2014, the balance in Scott and Robbye's joint checking account was $172,456.22. (Robbye's depo page 46, lines 9 – 15 and page 5 of exhibit 6.) Robbye now contends that $167,092.02 of the $172,456.22 that was in the checking account on April 30, 2014 belonged to her because, on April 30, 2014, she had deposited a cashier's check for $167,092.02, which was made payable solely to her, into the joint checking account. (Robbye's depo page 46, line 16, through page 47, line 8.) She contends that the $167,092.02 check was the proceeds of a $62,500 investment that was made in her name in 2004 using proceeds from the sale of a house in California which she and Scott had owned together. (Robbye's depo page 33, line 16, though page 34, line 20.)

On April 30, 2014, the balance in Scott and Robbye's joint savings account was $65,000, all of which had come from Scott's earnings. (Robbye's depo page 47, line 9 through page 48, line 17; and page 6 of Exhibit 6.)

### Robbye's Separate Bank Accounts

On July 30, 2014, Scott opened a checking account and a savings account in Robbye's name only. Robbye did not open the accounts. (Robbye's depo page 51, line 11 through page 52, line 25, and Exhibit 17 attached thereto.)

On July 31, 2014, the balance in the joint checking account was $35,663.89. (Robbye's depo, page 4 of Exhibit 13.) On the following day, August 1, 2014, Scott moved $25,000 out of the joint checking account and into Robbye's newly opened separate checking account (Robbye's depo page 60, lines 16 – 21; page 2 of Exhibit 13; and page 1 of Exhibit 17 ). That transfer left only $7,472.56 in the joint checking account. (Robbye's depo page 49, lines 4 – 6; and page 4 of Exhibit 13.)

On July 31, 2014, the balance in the joint savings account was $60,046.40. (Robbye's depo page 5 of Exhibit 13.) On the following day, August 1, 2014, Scott moved $60,046.40 out of the joint savings account and into Robbye's newly opened separate savings account (Robbye's depo page 60, line 22 though page 61, line 12). That transfer completely emptied the joint savings account. (Robbye's depo page 49, lines 7 – 13; page 4 of Exhibit 13; and page 2 of Exhibit 17.)

In her deposition, Robbye explained why Scott had opened separate accounts in Robbye's name and why Scott moved $25,000 from the joint checking account to the separate checking account and why Scott moved $60,046.40 from the joint savings account to the separate savings account:

> A. I was in California the day this account was opened, I had a teaching conference for home schooling moms. He [Scott] called and said there was going to be a judgment for one of these cases and they were going to seize his assets so his attorney had advised him to move my funds out of his accounts so that my funds wouldn't be seized with his funds. So that is how this account was opened.
>
> Q. That is why he did it then?
>
> A. Because his attorney advised him that my funds should be separate from him so that when they seized the assets, they would only take his. This also happened with my car later on. This wasn't related to bankruptcy; this was related to a fine, a judgment from the FINRA case or whatever this was from.
>
> Q. Oh, you mean this July 30th opening of the account was not related to the bankruptcy, is that what you just said?
>
> A. Yes, that is what I said. As far as I'm concerned and as far as I knew, he wasn't contemplating bankruptcy at this time. He was negotiating his fines with FINRA.

(Robbye's depo page 53, lines 1 – 24.)

> Q. And Scott opened the accounts at FirstMerit Bank in your name without your knowledge?
>
> A. This is the part I don't know, if he opened the account and then told me, or if he called me and told me he was opening it, but it was he who opened the account. I was in California. It wasn't completely without my knowledge; he called me and told me that this is what his attorney advised him to do.

(Robbye's depo page 58, lines 13 – 19.)

> Q. Further down on the same page [Exhibit 17], you see the account summary for Reality Savings account; beginning balance zero, one deposit of $60,046.40?
>
> A. Yeah, this would be where he is transferring my funds, which were what was left of the –
>
> Q. You are thinking of the 167?
>
> A. Whatever was left of it, he was moving it there because he said his attorney advised him to move my funds out of his account because of this judgment.

(Robbye's depo page 60, line 22 through page 61, line 8.)

> A. At the time he transferred my money out of our account and into my account, he was trying to prevent the – it had nothing to do

with bankruptcy. It had to do with the person who was trying to collect their settlement from the lawsuit. So the reason we had a fundamental disagreement about bankruptcy was because none of the bankruptcy had anything to do with our personal life. It had everything to do with his business and how he was managing his business. … These things that happened, happened in his business and they were impacting me personally. I didn't understand how you can have all this trouble in your business and … then it come back and impact your family.

(Robbye's depo page 85, line 19 through page 86, line 6; and page 86, line 18 -23.)

Q. You didn't want him to file? That was your fundamental difference; you didn't want him to file personal bankruptcy?

A. True.

Q. Why did he then?

A. Because the judgments against him, the legal judgments against him, were enormous and that is why he filed. … He was hoping to get a discharge of the fines he owed and the penalties as a result of his business.

Q. Did he get a discharge?

A. No. …

Q. So he had debts that you didn't owe?

A. Yes.

Q. Which is why you didn't have to file bankruptcy, because you didn't owe those debt?

A. Yes.

(Robbye's depo page 87, line 8 through page 88, line 9.)

Other than monthly interest paid by the bank, no money was deposited into the joint savings account between April 30, 2014, when it contained $65,016.90 (all of which came from Scott's earnings), and July 31, 2014, when it contained $60,046.40. (Robbye's depo Exhibits 10 through 13.)

Between April 30, 2014, when the joint checking account contained $172,456.22 and July 31, 2014, when it contained $35,663.89, some $25,110.34 was deposited into the joint

10941074_1 079884.1559    7

16-06017-rk    Doc 12    FILED 10/14/16    ENTERED 10/14/16 12:12:24    Page 7 of 19

checking account. (Robbye's depo Exhibits 10 through 13). None of those deposits came from Robbye.

### No Tracing Necessary

The Trustee does not seek to recover the $25,000 which Scott moved from the joint checking account into Robbye's separate checking account on August 1, 2014. Had the Trustee sought to recover that $25,000 transfer, Robbye might have argued that the $25,000 she received was traceable to her April 30, 2014 deposit of $167,092.02. In that case, Robbye would have to argue that the $167,092.02 belonged solely to her, that $25,000 transferred to her was not traceable to the $5,364.20 that was already in the joint checking account on April 30, 2014, nor to the $25,110.34 that was deposited into the joint checking account thereafter.

No such arguments are necessary, however, with respect to the $60,046.40 which Scott moved from the joint savings account into Robbye's separate savings account on August 1, 2014. Robbye had not put any money into the joint savings account, either directly or through transfers from the joint checking account. All of the $60,046.40 is easily and directly traceable to Scott. None of it is traceable to Robbye. The Trustee seeks to avoid and recover the $60,046.40 transfer of Scott's money to Robbye.

### The Other Transfers

The Trustee also seeks to avoid and recover a $3,000 transfer by Scott to Robbye which did not involve the joint accounts. During 2013 and 2014, Scott had a separate checking account at JPMorgan Chase Bank. Robbye's name was not on that account. (Robbye's depo page 74, lines 6 – 21.) On September 12, 2014, Scott transferred $3,000 to Robbye via a check drawn on his separate checking account at JPMorgan Chase Bank. (See paragraph 54 of the Amended Complaint and Robbye's depo page 84, line 1 – 7, and page 16 of Exhibit 32.)

The Trustee also seeks to avoid and recover a $6,000 transfer from Scott to Robbye which did not involve the joint accounts. (see paragraph 64 of the Amended Complaint.) This is what Robbye said about that:

> Q. You know that Scott said he sold a Razor and gave you the proceeds?
>
> A. I know he said that.
>
> Q. Did he?
>
> A. He did something with the proceeds; I can't trace what he did. I looked through my account and I can't trace where he put it.
>
> Q. Do you know when he sold it?
>
> A. Yes, November of 2014.
>
> Q. For cash.
>
> A. I don't know.
>
> Q. Was it $6,000?
>
> A. Something like that.

(Robbye's depo page 82, line 23 though page 83, line 12.)

On November 20, 2014, $7,023.36 was deposited into Robbye's separate checking account. At the time of her deposition, Robbye was not able to identify the source of that deposit. (Robbye's depo page 73, lines 13 – 17, and page 2 of Exhibit 21.)

### Lawsuits Pending Against Scott

By April 30, 2016, Robbye was aware that Scott had "a number things pending and a number of things in court and a number of things [Scott] was fighting with a team of attorneys." (Robbye's depo page 44, line 22 through page 45, line 3.)

On May 28, 2014, Eduardo S. Espinosa, in his capacity as Receiver of Retirement Value, LLC ("Espinoza"), obtained a judgment against Scott for $579,576.38 in the 126th District Court of Travis County Texas. (See Proof of Claim No. 2-1 filed by Espinoza in Scott's bankruptcy case, Case No. 14-62604. See also *Complaint and Objection to Dischargeability of Debt* filed by

Espinoza in Scott's bankruptcy case, where it was assigned Adversary Proceeding No. 15-06039.) Espinoza's judgment later became a lien on Scott and Robbye's house in Canton. (Robbye's depo page 27, lines 16 – 24.)

### Scott's Bankruptcy

On December 1, 2014, Scott filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division, at Canton, thereby commencing the within bankruptcy case. (Case No. 14-62604.) According to the Amended Bankruptcy Schedules which he filed on March 27, 2015, Scott had, as of December 1, 2014, assets which were worth $794,497.13, and liabilities which totaled $1,845,805.22 (Docket No. 47, page 4.) Those liabilities included the Espinosa judgment for $579,628.26. They also included $190,000 owed to Sessions, Fishman, Nathan & Israel LLC for attorney's fees. (Docket No. 47, page 11.) Scott's Amended Statement of Financial Affairs showed that he had $390,127.92 in gross income in the first eleven months of 2014. (Docket No. 47, page 13.) That statement also shows that Scott sold a Razor ATV for $6,000 through Craigslist in October 2014. (Docket No. 47, page 15.)

### Scott's Waiver of Discharge

On June 16, 2015, the United States Trustee ("UST") filed a complaint seeking to deny Scott a discharge in bankruptcy, thereby commencing Adversary Proceeding No. 15-06042. In paragraph 18 of his Complaint, the UST alleged that Scott and/or Robbye transferred over $60,000 from a jointly owned and controlled savings account into Robbye's solely owned and controlled savings account beyond the reach of Scott's creditors. In paragraph 17 of his Complaint, the UST alleged that the joint savings account contained funds contributed by Scott alone. Scott testified in that case that "So if there was any movement of savings, and Robbye

will attest to this, any movement of savings would be initiated from her and her alone." After that deposition, Scott's attorney asked Robbye to attest to that and she refused. (Robbye's depo page 54, line 2 through page 55, line 10.) An agreed order waiving Scott's discharge was entered in that adversary proceeding on November 12, 2015. (Docket No. 9.)

II. LAW

    A.    **Jurisdiction and Venue**

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and pursuant to General Order No. 2012-7 entered in the Northern District of Ohio. This adversary proceeding to avoid and recover fraudulent transfers is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H) and (O). The Northern District of Ohio is the proper venue for this adversary proceeding pursuant to 28 U.S.C. § 1409(a).

    B.    **Summary Judgment**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056. There is no issue of material fact "[w]here the record taken as a whole could not lead [the] trier of fact to find for the non-moving party." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is "material" if it would affect the outcome of the case, and the dispute is "genuine" if the evidence is such that a reasonable juror could return a verdict for the non-moving party. *Henson v. National Aeronautics & Space Administration*, 14 F.3d 1143, 1148 (6th Cir. 1994).

The moving party bears the initial burden of establishing that no genuine issues of material fact exist. *Smith v. Transworld Systems, Inc.*, 953 F.2d 1025, 1028 (6th Cir. 1992). Nevertheless, the non-moving party must present probative evidence in support of its claim (in addition to its

pleadings).  *Id.*  Thus, the non-moving party has the ultimate burden to show the existence of a genuine issue of material fact.  *Id.*; *see also*, *Matsushita*, 475 U.S. at 586.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. ... In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a <u>genuine issue for trial</u>." F. R. Civ. Proc. 56(e) (emphasis added). ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Matsushita*, 475 U.S. at 586-87 (citations and footnotes omitted).

Further, a party may not avoid summary judgment by raising issues of fact that are not material or relevant to the legal issues before the court. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Additionally, the mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to preclude summary judgment, as there must be evidence from which the jury could reasonably find for the non-moving party.  *Id.* at 252.  Further, the non-moving party must go beyond the pleadings and other evidence and designate "specific facts showing there is a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

**C.     Avoidance and Recovery of the Fraudulent Transfers**

The Trustee may bring both state and federal causes of action to set aside a fraudulent transfer.  An action under federal law is premised upon 11 U.S.C. § 548, which provides:

> **(a)(1)** The trustee may avoid any transfer … of an interest of the debtor in property … that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>
> **(A)** made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> **(B)**    **(i)** received less than a reasonably equivalent value in exchange for such transfer or obligation; and **(ii)(I)** was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

Ohio law is applicable through 11 U.S.C. § 544. Section 544(b)(1) of the Bankruptcy Code permits a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title." 11 U.S.C. § 544(b)(1). A creditor may avoid a transfer or an obligation found to be fraudulent under Ohio Revised Code §§ 1336.04 and 1336.05. A transaction can be set aside as a fraudulent conveyance whenever it is made without fair consideration and when the conveyance will either render the transferor insolvent or when the transferor makes a conveyance to hinder, delay or defraud creditors. *John Deere Indus. Equip. Co. v. Gentile,* 9 Ohio App.3d 251, 459 N.E.2d 611 (1983); *see also Fifth Third Bank of Columbus v. McCloud,* 90 Ohio App.3d 196, 628 N.E.2d 131 (1993). If the debtor is rendered insolvent by the transaction, the movant is not required to establish any intent on the part of the debtor to hinder, delay or defraud. *McKinley Fed. S & L v. Pizzuro Enter., Inc.,* 65 Ohio App.3d 791, 585 N.E.2d 496 (1990).

Accordingly, a plaintiff may prevail upon constructive fraudulent transfer claims by showing that a debtor did not receive reasonably equivalent value in exchange for the transfer *and* by showing either (1) that debtor was insolvent at the time of the transfer, or was rendered insolvent as a result thereof, or (2) that as a result of the transfer, debtor intended to, believed she would, or should have reasonably believed that she would, incur debts beyond her ability to pay as the debts matured. *In re Gabor*, 280 B.R. 149, 155 (Bankr. N.D. Ohio 2002). Once a transfer is avoided under 11 U.S.C. §§ 548 or 544, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from the initial transferee of such transfer." 11 U.S.C. § 550(a)(1).

Although the Trustee bears the initial burden of proof, by a preponderance of the evidence, this burden may be shifted to the defendant upon showing certain "badges of fraud." *In re Gabor*, 280 B.R. at 155; *see also*, *Tavenner v. Smoot,* 257 F.3d 401 (4th Cir.2001); *Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio,* 37 Ohio App.3d 162, 524 N.E.2d 915 (1987); *Andrews v. United States,* 69 F.Supp.2d 972 (N.D. Ohio 1999). These badges include: whether the transfer was to an insider; whether before the transfer was made the debtor had been sued or threatened with suit; whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; and whether the debtor was insolvent or became insolvent shortly after the transfer was made. *See*, Ohio Rev. Code Ann. § 1336.04(B). The presence of these badges of fraud allows a court to presume a debtor's fraudulent intent. *In re Gabor*, 280 B.R. at 157.

In determining whether a debtor received reasonably equivalent value, courts must review "all the surrounding circumstances to determine whether the transaction is fair." *John Ownbey Co. v. Commissioner,* 645 F.2d 540, 545 (6th Cir. 1981). In assessing whether a challenged transfer is supported by reasonably equivalent value, courts generally compare the value of the property transferred with the value of that received in exchange for the transfer. *See Blood v. Nofzinger*, 162 Ohio App. 3d 545, 560 (Ohio App. 6 Dist., 2005). The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires a court to determine the value of what was transferred and to compare it to what was received. *In re Gabor*, 280 B.R. at 158. Whether consideration supporting a challenged transfer is "fair" must be determined from the standpoint of the debtor. *Id.* at 158 - 59.

Balance sheet insolvency establishes that a debtor is "insolvent" for purposes of fraudulent transfer analysis under both federal and Ohio law. *See generally*, *In re Gabor*, 280

B.R. at 160. "Insolvency then is basically a balance sheet test: that is, a debtor is insolvent when the debtor's liabilities exceed the debtor's assets, excluding the value of preferences, fraudulent conveyances and exemptions." *Foreman Indus., Inc. v. Broadway Sand and Gravel (In re Foreman Indus., Inc.),* 59 B.R. 145, 149 (Bankr. S.D. Ohio 1986).

### III. ANALYSIS

#### A. Transfer of an interest of the debtor in property.

Bankruptcy Code Section 548(a) begins by saying "The trustee may avoid any transfer … of an *interest of the debtor in property*…." If she opposes this motion, Robbye will likely argue that the $60,046.40 which Scott transferred from the joint *savings* account into Robbye's separate savings account on August 1, 2014 was not Scott's property, but hers. Such argument would likely be based upon the $167,092.02 which was deposited into the joint *checking* account on April 30, 2014, some three months before the transfer. She will likely argue that the $167,092.02 belonged solely to her (which the Trustee does not concede).

Robbye has conceded that the $65,000 which was in the joint *savings* account on April 30, 2014 all came from Scott, and that she did not deposit anything into the joint *savings* account. Thus the $60,046.40 which was in the joint *savings* account on July 31, 2014 *was indeed* Scott's property, by the same logic Robbye uses to claim that $167,092.02 in the joint checking account on April 30, 2014 was her property. She may not like the fact that there was only $35,663.89 left in the joint checking account on July 31, 2014, but that does not give her a claim to money in a different account - the savings account. (See the discussion about tracing above.)

The $3,000 transfer came from Scott's separate checking account at JPMorgan Chase Bank. The $6,000 transfer came from the sale of Scott's Razor ATV.

### B. Actual Fraud: Intent to hinder, delay or defraud pursuant to 11 U.S.C. §548(a)(1)(A) and Ohio Revised Code § 1336.04(A)(1)

As this Court articulated in *Gabor*, the existence of the badges of fraud will shift the burden of proof to Defendant to establish the validity of the Transfer. 280 B.R. at 155.

Several badges of fraud exist in this case. The circumstances and timing of the August 1, 2014 transfer by Scott of $60,046.40 from his savings account to Robbye's savings account clearly indicate that Scott intended to hinder, delay or defraud his creditors. The same came be said about the September 12, 2014 transfer of $3,000 from Scott's separate checking account to Robbye and the November 2014 transfer of $6,000 from Scott to Robbye.

First, the three transfers were all made to Scott's then wife, Robbye, who was an insider, as that term is defined in Bankruptcy Code Sections 101(31) [insider includes relative of the debtor] and 101(45) [relative means individual related by affinity or consanguinity] and in Ohio Revised Code Sections 1336.01(G)(1)(a) [insider includes a relative of the debtor] and 1336.01(K) [relative includes a spouse].

Second, at the time of the transfers, Scott was already subject to Espinosa's May 28, 2014 judgment for $579,576.38 and had, according to Robbye, **"a number things pending and a number of things in court and a number of things [Scott] was fighting with a team of attorneys."**

Third, the three transfers were all made within 122 days before Scott filed his bankruptcy petition. The $6,000 transfer occurred less than 30 days before Scott filed his bankruptcy petition.

Fourth, Scott did not receive reasonably equivalent value in return for the transfers

Fifth, given his sworn statement in his bankruptcy schedules that he had, as of December 1, 2014, liabilities of $1,845,805.22 and assets worth only $794,497.13, Scott was clearly

insolvent, from a balance sheet perspective, in August, September, and November of 2014, when the transfers were made. His liabilities exceeded his assets by $1,051,308.09.

Based upon the existence of the foregoing badges of fraud, the Court may presume that Scott made the transfers with actual intent to hinder, delay or defraud his creditors.

But in this case, there are more than badges of fraud from which the Court can find an actual intent to hinder, delay or defraud Scott's creditors. Scott's wife, Robbye, to whom the transfers were made, has testified as to Scott's actual intent when he transferred more than $85,000 from their joint accounts into her separate accounts on August 1, 2014, leaving less than $7,500 in their joint accounts:

> He [Scott] called and said there was going to be a judgment for one of these cases and they were going to seize his assets so his attorney had advised him to move my funds out of his accounts so that my funds wouldn't be seized with his funds. …
>
> Because his attorney advised him that my funds should be separate from him so that when they seized the assets, they would only take his. …
>
> … this was related to a fine, a judgment from the FINRA case or whatever this was from.
>
> … he was moving it there because he said his attorney advised him to move my funds out of his account because of this judgment.
>
> It had to do with the person who was trying to collect their settlement from the lawsuit
>
> Because the judgments against him, the legal judgments against him were enormous.

Because the transfers were made with actual intent to hinder, delay or defraud creditors, the Trustee is entitled to judgment as a matter of law upon her claims pursuant to 11 U.S.C. § 548(a)(1)(A) and R.C. § 1336.04(A)(1). (Count I and Count V with respect to the $60,046.40 transfer, Count X with respect to the $3,000 transfer, and Count XIII with respect to the $6,000 transfer.)

### C. Constructive Fraud Pursuant to 11 U.S.C. § 548(a)(1)(B) and Ohio Revised Code § 1336.05(A).

Should the Court find that summary judgment is not appropriate on the Trustee's actual fraud claims, the Court can and should find that the transfers were constructively fraudulent in that Scott did not receive reasonably equivalent value in exchange, Scott was insolvent at the time of the transfers, and Scott had creditors (including Espinosa) whose claims arose before the transfers were made.

Because there is no genuine issue of material fact with regard to whether Scott received reasonably equivalent value or whether Scott was insolvent at the time of the transfer, the Trustee is entitled to judgment as a matter of law avoiding the fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B) and Ohio Revised Code § 1336.05(A). (Count IV and Count VI with respect to the $60,046.40 transfer, Count XI with respect to the $3,000 transfer, and Count XIV with respect to the $6,000 transfer.)

## IV. CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary judgment in favor of the Trustee and against the Defendant Robbye Schroeder and enter an order (i) avoiding the transfers of $60,046.40, $3,000, and $6,000 as fraudulent transfers; and (ii) entering judgment in favor of the Trustee and against the Defendant Robbye Schroeder in the total amount of $69,046.40.

Respectfully submitted,

/s/ Roger J. Stevenson
Roger J. Stevenson – 0014366
Bruce R. Schrader, II – 0039418
Roetzel & Andress, LPA
222 South Main Street
Akron, OH 44308
E-mail: bschrader@ralaw.com
E-mail: jrutter@ralaw.com
Telephone: 330.376.2700
Facsimile: 330.376.4577

ATTORNEYS FOR PLAINTIFF ANNE PIERO SILAGY, CHAPTER 7 TRUSTEE

**CERTIFICATE OF SERVICE**

This is to certify that the Trustee's Motion for Summary Judgment was electronically transmitted on October 14, 2016 via the Court's CM/ECF system to the following who are listed on the Court's Electronic Mail Notice List:

- Jack B. Cooper    jbcooper@dayketterer.com
- Bruce R. Schrader    bschrader@ralaw.com
- Roger J. Stevenson    rstevenson@ralaw.com
- United States Trustee    (Registered address)@usdoj.gov

/s/ Roger J. Stevenson
Roger J. Stevenson

10941074 _1 079884.1559

19

16-06017-rk    Doc 12    FILED 10/14/16    ENTERED 10/14/16 12:12:24    Page 19 of 19